1

1

2  UNITED STATES DISTRICT COURT

3  NORTHERN DISTRICT OF NEW YORK

4  ---------------------------------------------

5  NICHOLE MARIE MCDANIEL, ET AL.

6

7

8

9            Plaintiff,

10    -versus-                        04-CV-757

11                        (FINAL FAIRNESS HEARING)

12

13  THE COUNTY OF SCHENECTADY

14

15

16            Defendant.

17  ---------------------------------------------

18

19            TRANSCRIPT OF PROCEEDINGS held in and for

20  the United States District Court, Northern District of

21  New York, at the James T. Foley United States Courthouse,

22  445 Broadway, Albany, New York  12207, on WEDNESDAY,

23  SEPTEMBER 5, 2007, before the HON. GARY L. SHARPE,

24  United States District Court Judge.

25

2

```
 1
 2   APPEARANCES:
 3
 4   FOR THE PLAINTIFFS:
 5
 6   LAW OFFICE OF ELMER R. KEACH
 7   BY:  ELMER R. KEACH, III, ESQ.
 8           - and -
 9   BERANBAUM, MENKEN LAW FIRM
10   BY:  BRUCE E. MENKEN, ESQ.
11
12
13
14   FOR THE DEFENDANT:
15
16   GOLDBERG, SEGALLA LAW FIRM
17   BY: WILLIAM J. GREAGAN, ESQ.
18
19
20
21
22
23
24
25
```

```
 1              (Court commenced at 3:00 PM.)

 2                   THE CLERK:  The date is Wednesday, September 5,

 3    2007, at 3:03 PM.  In the matter of Nichole Marie McDaniel, et

 4    al. versus the County of Schenectady et al, Case Number

 5    2004-CV-757.  We're here for a final fairness hearing.  Can we

 6    have appearances for the record, please.

 7                   MR. MENKEN:  Bruce Menken, Beranbaum, Menken,

 8    80 Pine Street, New York, New York, for the plaintiffs and

 9    class.  Good afternoon, your Honor.  And thank you very much

10    for your patience and I apologize for the delay.

11                   THE COURT:  All right.  Thank you.  Good

12    afternoon.

13                   MR. KEACH:  Robert Elmer Keach, III, law

14    offices of Robert Elmer Keach, PC, 1040 River Front Center,

15    Amsterdam, New York 12010, and your Honor, this is my

16    paralegal Heather Decker.  Good afternoon, your Honor.

17                   THE COURT:  Good afternoon.

18                   MR. GREAGAN:  William J. Greagan, for the

19    defendants, Goldberg, Segalla, 7 South Woods Boulevard,

20    Albany, New York 12211.

21                   THE COURT:  Good afternoon.

22                   MR. GREAGAN:  Good afternoon, your Honor.

23                   THE COURT:  All right.  Let's take up the

24    proposed order that was submitted to me that allows for the

25    filing of late claims.  Is there anything to add to the
```

4

```
 1   request on the part of the class or any responses that the
 2   defendants care to make to that proposed order?
 3                 MR. KEACH:  Your Honor, there is a lady by the
 4   name of Laura Lichenstein (phonetic) who contacted me, and
 5   then also contacted Mr. Greagan, she's a class member; she
 6   contacted me this morning and provided me with a late claim;
 7   and she is a member of the class.  So that would be one more
 8   person in addition to those that are reflected on that Order.
 9   If your Honor would like, I can very quickly submit another
10   proposed order that reflects Miss Lichenstein's participation
11   in the class if your Honor is amenable to allow me all the
12   details in the order.
13                 THE COURT:  So instead of 33, it would become
14   34 with her?
15                 MR. KEACH:  Yes, sir.
16                 THE COURT:  All right.  Any objections to that
17   on the part of the defendant?
18                 MR. GREAGAN:  No, your Honor.
19                 THE COURT:  John, is that going to need to be
20   filed in the e-mailbox?
21                 THE CLERK:  If they wanted to provide it to the
22   e-mailbox, they could.
23                 THE COURT:  I will issue the order, so please
24   submit it.  At the conclusion of the proceedings today, you
25   can get the e-mail address from John and he'll give you the
```

1    address where to e-mail the order.

2                   MR. KEACH:  Okay.  In PDF version or...

3                   THE COURT:  Well, that's the whole point.

4                   THE CLERK:  It should be Word Perfect.

5                   THE COURT:  You got Word?

6                   MR. KEACH:  I don't have Microsoft Word.

7                   THE COURT:  John, does that convert?

8                   THE CLERK:  I think I can convert it.  That

9    will be fine.

10                  THE COURT:  All right.  Educate me.  What's the

11   ECM notification order -- let's not worry about this case --

12   what, in general, does it require?

13                  THE CLERK:  It requires that the document be

14   submitted in Word Perfect format.  Just for the simple point

15   of converting it from Word Perfect to PDF.  But if it is in

16   Word, Word can be converted to Word Perfect, which Word

17   Perfect can then be converted to PDF.

18                  THE COURT:  So it's okay then for him to submit

19   it to the mailbox?

20                  THE CLERK:  Correct.

21                  THE COURT:  Okay.  What we're talking about,

22   just to send education out to the community, is there's a

23   requirement in one of the local rules, it's in that either

24   standing order or local rule dealing with electronic

25   notification and filing of documents by the parties, that when

1    you submit a proposed order, you submit it to this mailbox

2    location that's included in the order.  And the function of

3    that is, it's common when the Court gets a proposed order that

4    it might make an alteration or two to the proposal to whoever

5    is proposing it, and in order to do that, we've got to be able

6    to convert it over to a document where we can go in, make the

7    alterations we want and execute the order in its final format.

8    That's the function of the entire process.  And the Court is

9    working its way through those requirements just as all the

10   parties and litigants and lawyers in town are working their

11   way through it as well.  But for the record, it's my intention

12   to issue the order with the amendment as is proposed and

13   permit the additional late filing.  And if counsel would

14   submit a proposed order to me, I'll go ahead and execute it

15   when I receive it.  All right.

16           MR. KEACH:  Thank you, your Honor.

17           THE COURT:  All right.  We're here, in essence,

18   to consider the settlement that's been reached by the parties.

19   And from an overall perspective, the Court must determine that

20   the class action settlement is fair, adequate and reasonable

21   and not a product of collusion.  So that's the overall issue

22   before the Court.  I'm citing there D'Amato, which is 236 F.3d

23   78 at 85, Second Circuit's 2001 decision.

24           I have reviewed all of the papers that have

25   been submitted by the parties in connection with the purpose

1   for which we're here.  Let me take up two collateral issues

2   that impact on the primary issue, and that is, what's left in

3   the class pool.  There are two issues in that regard that have

4   an impact on what's left in the class pool.  One is the

5   incentive awards.  The other is the attorneys' fees.  Because

6   as I read the proposed settlement of the parties, the

7   settlement is $2.5 million.  So the question is, in essence,

8   what goes to the lawyers out of that 2.5, what goes to the two

9   individuals by way of incentive awards.  And when I talk about

10  the lawyers, I'm also throwing into that hopper the costs and

11  disbursements and those things.  But let me first take up the

12  incentive awards.

13              In this case, it's claimed that Lessie Davies,

14  while living in a homeless shelter, kept in touch with

15  counsel, appeared as scheduled to be deposed by the

16  defendants, and that without her efforts, this action may well

17  have had a different impact.  It is further claimed that

18  William Smith agreed to serve as class representative in 2005

19  and provided class counsel with assistance in locating and

20  speaking to the members of the class.  His intervention was

21  eventually unnecessary because of the parties' effort to

22  resolve the action.  Generally speaking, when a person joins

23  in bringing an action as a class action, he's disclaimed any

24  right to a preferred position in the settlement.  An incentive

25  award may be appropriate, if necessary, to induce an

1    individual to participate in the suit.  There are really no

2    allegations that Miss Davies needed to be induced to

3    participate in the suit.  Other relevant factors include the

4    actions the plaintiff has taken to protect the interests of

5    the class, the degree to which the class has benefited from

6    those actions, and the amount of time and effort the plaintiff

7    expended in pursuing the litigation.  In appropriate

8    circumstances, the class representative can get an incentive

9    award for the risks they take in their vanguard role in the

10    litigation.

11              In this case, I have no difficulty, given the

12    overall standard of my approval authority, in approving an

13    incentive award for Lessie Davies in the amount of $12,000 as

14    for the proposed intervenor; the other individual, $1,500.  So

15    I approve those components of the settlement.

16              Let me turn to the issue of attorneys' fees.  I

17    do not approve of the proposal that's been submitted to me,

18    though it's been submitted to me in alternatives.  Let me give

19    you the benefit of my ruling and tell you how I see it.

20              Class counsel has applied for $650,000 in

21    attorneys' fees and expenses.  This represents approximately

22    26 percent of the 2.5 million common funds of the settlement.

23    Comparing this to the lodestar amount, this would amount to

24    between 1.98 to 2.24 times counsels' ordinary hourly fees

25    which they calculate to be approximately $344,795 or 756.

1   This amount is what class counsel would regularly charge in

2   their home jurisdiction.  This amount is based on each

3   attorneys' ordinary billing rates, not the prevailing market

4   rates used in the Northern District of New York when awarding

5   attorneys' fees in civil rights cases under 42 USC 1988.  The

6   amount they would get if they were from the Northern District

7   of New York is $285,412.

8               What constitutes a reasonable fee is properly

9   committed to the sound discretion of the District Court.

10  That's Goldberger, 209 F.3d 43, Second Circuit 2000.

11  Moreover, the Court is to act as a fiduciary who must serve as

12  a guardian of the rights of absent class members.  Thus, the

13  Court must approach fee awards with an eye to moderation.  In

14  the past, both the lodestar and the percentage of fund methods

15  have been available to district judges in calculating

16  attorneys' fees in common fund cases.  Let me point out that

17  the lodestar, which now has a new name under which the

18  district court scrutinizes the fee petition to ascertain the

19  number of hours reasonably billed to the class and then

20  multiplies that figure by an appropriate hourly rate, once

21  that initial computation has been made, the district court

22  may, in its discretion, increase the lodestar by applying a

23  multiplier based on other less objective factors such as the

24  risk of litigation and the performance of the attorneys.  The

25  second method is simpler.  The Court sets some percentage of

1   the recovery as the fee in determining what percentage to

2   award, the courts have looked to the same less objective

3   factors that are used to determine the multiplier for the

4   lodestar.

5              Of course, no matter which method is chosen,

6   the Court should continue to be guided by the traditional

7   criteria in determining a reasonable common fund fee,

8   including the time and labor expended by counsel, the

9   magnitude and complexities of the litigation, the risk of the

10  litigation; the quality of representation, the requested fee

11  in relation to the settlement, and public policy

12  considerations.  However, the Second Circuit has recently

13  noted that the meaning of the term "lodestar" has shifted over

14  time and its value as a metaphor has deteriorated to the point

15  of unhelpfulness.  That's Arbor Hill, which may be found at

16  2007 Westlaw 204106, July 12, 2007, Second Circuit.

17             Concerning the lodestar method, the Court noted

18  that the Court abandoned its use.  The better course than the

19  one most consistent with attorneys' fees jurisprudence is for

20  the district court, in exercising its considerable discretion,

21  to bear in mind all of the case specific variables that this

22  court and other courts have identified as relevant to the

23  reasonableness of attorneys' fees in setting a reasonable

24  hourly rate.  Accordingly, the reasonable hourly rate is the

25  rate a paying client would be willing to pay.

1    In determining what rate a paying client would

2    be willing to pay, the district court should consider, among

3    others, the Johnson factors.  It should also bear in mind that

4    a reasonable paying client wishes to spend the minimum

5    necessary to litigate the case effectively.  The district

6    court should also consider the section individual might be

7    able to negotiate with his or her attorneys, using their

8    desire to obtain the reputational benefits that might accrue

9    from being associated with the case.  The district court

10   should then use that reasonable hourly rate to calculate what

11   can properly be termed the presumptively reasonable rate.

12   In that regard, the Johnson factors refer to

13   Johnson versus Georgia Highway Express, 488 F.2d 714, Fifth

14   Circuit, 1974.  The Johnson factors are 12 in number:  The

15   time and labor required; the novelty and difficulty of

16   questions; the level of skill required to perform the legal

17   service properly; the preclusion of employment by the attorney

18   due to acceptance of the case; the attorney's customary hourly

19   rate; whether the fee is fixed or contingent; the time

20   limitations imposed by the client or the circumstances; the

21   amount involved in the case and the results obtained; the

22   experience, reputation and ability of the attorneys; the

23   undesirability of the case; the nature and length of the

24   professional relationship with the client; and awards in

25   similar cases.

1           Having said that, mind you, the Circuit says in

2    Arbor Hill that we've now simplified the process of now

3    ascertaining attorneys' fees.  I guess the test of time will

4    demonstrate whether that's so or not.  What the Circuit has

5    recently restated is that in calculating the presumptively

6    reasonable fee, the analysis involves determining the

7    reasonable hourly rate for each attorney and the reasonable

8    number of hours expended and multiplying the two figures

9    together to obtain the presumptively reasonable fee award.

10   That's Porzig, P-O-R-Z-I-G, 2007 Westlaw, 2241592.  That's an

11   August 7, 2007 Second Circuit decision.

12           It noted that courts are regularly called upon

13   to conduct a reasonable fee analysis even though a lawyer may

14   have taken the case on a contingent fee.  Considering the

15   factors I've outlined, the Court believes that the percentage

16   method is unreasonable.  Instead, the Court elects to

17   determine what amount is reasonable using the factors

18   articulated in Goldberger and the most recent Arbor Hill

19   decision.

20           Among the factors to consider is the time and

21   labor expended, the first Goldberger factor.  This factor is

22   satisfied.  It does appear that class counsel put substantial

23   time and effort into this case, including investigating it,

24   prosecuting it, conducting discovery, and engaging in

25   settlement negotiations, responding to inquiries of potential

1    class members, as examples.  This Court can conclude that the

2    time and effort is adequately compensated by allowing the

3    attorneys their ordinary and customary hourly rates for the

4    hours expended.  Moreover, while multipliers may be

5    appropriate in some instances, it's not appropriate in this

6    case.  Class counsel has had at least two other similar cases

7    in this district such that some of the ground work for this

8    litigation was already established.  If the Court were to

9    allow the substantial attorney fee award of 26 percent or

10    apply a multiplier to the reasonable amount, this would not be

11    fair or reasonable for a fee paying client.  As previously

12    discussed, the case is not particularly complex.  It's an

13    ordinary civil rights case in which liability appears

14    reasonably certain.  Thus, the second Goldberger factor,

15    complexities of the litigation, is low but does not

16    necessarily defeat the reasonableness of attorneys' fees.

17            The third Goldberger factor is to consider the

18    risk.  All cases have inherent risk.  As noted, however,

19    liability was reasonably certain.  Indeed, there was risk on

20    the issue of damages, however.  The damages risk is of little

21    consequence to an attorney for a prevailing plaintiff in a

22    civil rights case who's entitled to obtain attorneys' fees

23    pursuant to 14 USC 1988.  Thus, even if class counsel was

24    successful after a trial and a jury awarded some nominal

25    amount, the attorneys would be entitled to a reasonable hourly

1   rate subject to any modification based upon the result

2   achieved and other pertinent factors.  If a jury awarded a

3   significant fee absent evidence of any other fee agreement

4   between plaintiffs and counsel, counsel would still be limited

5   to the reasonable hourly rate subject to certain reasonable

6   modifications.  Of course, there's a risk of losing the case

7   and recovering no fees, but this is a risk every lawyer takes

8   in handling matters on a contingency basis.

9             As to the fourth Goldberger factor, the quality

10  of representation, the Court believes the class counsel did a

11  fine job and obtained a good settlement.  However, counsel are

12  adequately compensated for their services by using the

13  reasonable hourly rate for services actually performed.

14            As to the fifth factor, the requested fee in

15  relation to the settlement is unreasonable.  Through the

16  percentage method, counsel seeks roughly 26 percent of the

17  common fund, including multipliers.  However, without any

18  modifications, the actual weight for work performed,

19  compensating counsel for that work as billed from their

20  area -- in other words, not applying the traditional lodestar

21  method -- constitutes approximately 13 percent of the common

22  fund.  This percentage, 13 percent, is squarely within the

23  range of reasonable percentages in such a case, as is

24  demonstrated by Goldberger itself.

25            The final Goldberger consideration is that of

1   public policy.  The Court in Goldberger provided numerous

2   compelling public policy reasons for keeping an eye on

3   attorneys' fees in class action cases.  Arbor Hill, the

4   additional factors the Court must consider are the preclusion

5   of employment by the attorney due to acceptance of the case.

6   The Court notes Mr. Keach's mention that his resources were

7   stretched to the limit in this case.  Counsel's normal rate,

8   the settlement agreement which states that the rate will not

9   exceed 26 percent, the amount involved in the case, the

10  result, the undesirability of the case, the nature and length

11  of the professional relationship with the client, and the

12  awards in similar cases, taking all of these factors into

13  consideration, the Court must ascertain what fee is

14  reasonable.

15          Based on the discussion I've just provided, I

16  decline to use the percentage method or any type of

17  enhancement to award the attorneys more money than time

18  actually worked.  Having reviewed the time records submitted

19  in connection with this motion and in lieu of the Arbor Hill

20  decision, the Court declines to adjust the hourly rates

21  despite the time sheets submitted to the Court which include

22  hourly rates up to $450 which are higher than those charged in

23  the Northern District of New York.  What I'm saying by that

24  is, I'm not adjusting the rates down by virtue of the old

25  jurisprudence in the lodestar; I'm leaving the rates as billed

1   by the lawyers as reflected by their hourly billing rates.

2                    Based on the foregoing, the Court allows

3   attorneys' fees in the amount of $344,795 and includes monies

4   for future work to be performed.  The Court further allows

5   unreimbursement litigation expenses in the amount of

6   $9,001.50; I believe that's the amount that's been submitted;

7   and $107,000 in administrative expenses.  This totals

8   $460,796.50.

9                    That leads me back then, having ascertained

10  those, to the impact of that decision on the overall

11  settlement for the class.  So then I review, for purposes of

12  the ultimate decision, what I've already said; is that the

13  class action settlement is fair, adequate and reasonable, and

14  not a product of collusion.

15                   Persons wishing to be heard on these issues

16  were required to file a notice of appearance.  One notice was

17  filed by Keith Harris.  His letter did not reflect a basis for

18  the objection, only that he objected and intended to appear.

19  However, he's presently incarcerated in Five Points

20  Correctional Facility on robbery charges and is not eligible

21  for parole until next year.  The Court has heard from class

22  counsel and defense counsel.

23                   Looking at the procedural and substantive

24  fairness of the case, the Court looks to the history of the

25  case with which the Court is familiar, and it's evident that

1    the proposed settlement was the product of hard-fought,

2    arms-length negotiations between experienced class counsel and

3    experienced defense counsel and that settlement was achieved

4    only after significant discovery had taken place.  The

5    settlement process was lengthy.  The Court appreciates the

6    invaluable assistance that Judge Treece provided in that

7    process but recognizes, ultimately, it was the parties who

8    resolved the issues themselves.  Nonetheless, the Court finds

9    the settlement to be procedurally fair.  With respect to the

10   substantive fairness of the settlement, the Court has already

11   articulated the various factors that apply to that substantive

12   analysis, and the Court observes as follows about those

13   factors:

14             As to the first factor:  The complexity,

15   expense and likely duration of the litigation; that factor is

16   somewhat neutral and possibly tilts in favor of finding

17   substantive fairness.  The underlying legal claims are not

18   complex.  However, given the nature of those claims, including

19   the probability of any substantial recoveries, the cost of

20   prosecuting this case in light of the likely low recoveries,

21   the discovery needed to substantiate the claims and any

22   damages, this factor more favors approval of the settlement

23   than not.

24             As for the second factor, the reaction of the

25   class, this weighs in favor of approval.  There's only been

1   one objection to the proposed settlement, two have chosen to

2   opt out of the settlement, and over 875 people who submitted

3   claims, and there are additional late claims that the Court

4   has ordered accepted, it appears that the classes' reaction to

5   the proposed settlement has been positive.

6          As to the stage of the proceedings and the

7   amount of discovery completed, the third factor, this weighs

8   in favor of approving the settlement.  It's evident in this

9   case there's been extensive investigation of the factors

10  underlying the claims in the complaint and substantial

11  discovery.  There have been numerous depositions and

12  significant exchange of documents.

13         As to the fourth factor, the risks of

14  liability, class counsel concedes and the Court agrees that

15  risk establishing liability does not favor final approval of

16  the settlement.  From the Court's perspective, the issue of

17  liability does not appear to be complex.  Specifically,

18  liability issues were significantly impacted by the decision

19  in Marriott, at 227 Federal Rules Decision 159, Northern

20  District of New York, 2005, Judge Hurd's decision.

21         The risks of establishing damages, the fifth

22  factor, weighs strongly in favor of approval.  There are

23  numerous issues in the case such as this one that makes the

24  issue of damages subject to significant question.  Proving

25  more than nominal damages in this type of case is no easy

1   task.  It may require proof of physical or emotional harm,

2   which, again, is difficult to prove.  Moreover, one never

3   knows how a jury is likely to reward such injuries, if at all,

4   particularly when the class of plaintiffs which consist of

5   persons who tend to have run-ins with the law may not be

6   viewed with much sympathy.

7               The sixth factor, risk of maintaining the class

8   action through trial, has little bearing on the approval of

9   the settlement and, if anything, weighs against it.  The Court

10  finds that there are few risks that maintaining a class action

11  through trial particularly because the Court certified the

12  class.

13              The seventh factor, the ability of the

14  defendants to with strand greater judgment is somewhat

15  neutral.  It appears that the settlement has largely exhausted

16  the county insurance policy limits, but they've agreed to pay

17  some public money into the settlement fund.  However, further

18  award would likely cause detriment to its citizens.

19              The eighth and ninth factors, the range of

20  reasonableness of the settlement funds in light of the best

21  possible recovery and litigation risks is somewhat difficult

22  to gauge.  These types of cases are difficult to predict.  A

23  plaintiff may hit the lottery, so to speak, or can be awarded

24  nominal damages.  As noted, damages would be difficult to

25  prove.  Thus, on balance, the Court finds that these factors

1  weigh in favor of approval of settlement, although only

2  slightly.

3             Taking all of those factors into account, the

4  Court is satisfied that the proposed settlement is

5  substantively fair, in particular, given the Court's

6  modification on the attorney fee issue.

7             So for all of those reasons, the Court finds,

8  consistent with its findings relative to the various

9  components of the settlement, the settlement is substantively

10 and procedurally fair and in the best interests of the

11 members.

12            What, if anything, do the plaintiffs care to

13 share with me about the decision I've rendered?

14            MR. MENKEN:  Your Honor, needless to say, we're

15 disappointed with the Court's ruling on attorneys' fees; quite

16 satisfied, glad of the Court's ruling granting final approval

17 on what was a hard-fought case and what we, without a doubt,

18 as indicated in our papers, believe was a great settlement.

19 And it was done quickly and efficiently.  In fact, this case

20 was completed from beginning to end in much shorter fashion

21 than the Marriott case that your Honor cited.  And, in fact,

22 what has happened by your Honor's ruling, is that there is now

23 going to be a dis-incentive to settle cases in a quick and

24 efficient way because of the Court's refusal to follow the

25 percentage of fund method and attorneys' fees.

1              In assessing attorneys' fees, and as far as I

2    can tell, the Court has relied on, at least partially, in its

3    rejection and reduction in counsels' application for

4    attorneys' fees on Arbor Hill.  And I don't think that the

5    Court could -- Arbor Hill and this case are apples and

6    oranges.  Arbor Hill was not a class action case.  Arbor Hill

7    was a case where counsel for the prevailing party did not take

8    the amount of risk that counsel here took because they, as far

9    as we understand, were paid something for their work.

10             In addition, I think that Marriott and the

11   Neilsen (phonetic) case, which is that Maine case, are

12   completely on all fours with this decision -- with this case.

13   And if, in fact, the Court were to use Arbor Hill as a

14   barometer in setting a reasonable attorney's fee, I think that

15   the Neilsen case, in conjunction with the Arbor Hill case

16   suggests that in ascertaining what a customer would pay for a

17   class action civil rights lawyer in the Capital District area,

18   it would have to, as Judge Hornby did in the District of

19   Maine, use the conventional personal injury model, where the

20   one third number was something that was more in line and what,

21   in fact, Judge Hornby used in the District of Maine to grant

22   counsel the 25 percent.

23             We have in our settlement agreement preserved

24   our right to appeal on this issue and we will review your

25   Honor's record that was made and we'll consider our options,

1   and I respectfully object.  And Mr. Keach may want to mention

2   something about the Goldberger factors.

3              MR. KEACH:  Id your Honor begrudge me the right

4   to make an additional record.

5              THE COURT:  No, please do.

6              MR. KEACH:  Okay.  I think the Court -- one of

7   the points the Court made when it addressed the Goldberger

8   factors was the risk involved and the Court's perception that

9   counsel did not bear risks at the time they filed this case.

10  At the time this case was filed, the decision that your Honor

11  references as addressing the risk, the Marriott case, had not

12  come down.  Had Judge Hurd ruled the other way in Marriott,

13  and I'm not sure the Judge's name, but a decision in the

14  Southern District, Steinberger versus County of Rockland, oh,

15  it's Judge Bryant, ruled, in fact, the changeout that was the

16  discussion -- or was the -- was one of the contested issues in

17  this case is, in fact, constitutional, had Judge Hurd ruled as

18  Judge Bryant did and/or had the Second Circuit reversed Judge

19  Hurd, I think the Court would have a much different perception

20  of the risks we bore at the time that we filed this action.

21              Additionally, and this is not in the papers I

22  filed with the Court, but if the Court -- while certainly the

23  Marriott case has gone relatively well, while the Rensselaer

24  County case, you know, was resolved -- I don't want to say

25  that case went particularly well, but it was resolved, if the

```
 1   Court wants introspect as to the difficulties or a contrast as
 2   to the difficulties that are faced in this litigation, I
 3   direct the Court to Critcher (phonetic) versus County of Erie,
 4   which resulted in re county of Erie, which we lost, which is
 5   one of the seminal decisions now being rendered in the -- was
 6   a seminal decision of the Second Circuit, in fact in the
 7   country, about the privilege that attaches to Government
 8   lawyers.  And when they provide mixed advice about policy and
 9   also, you know, legal matters, and that case has been going on
10   largely for as long as this case has, we have spent probably
11   as much, if not more time than working on this case; as much,
12   if not more time in attorneys' fees; and that case has no hope
13   of resolution for the foreseeable future for a number of
14   different, a number of difference reasons.  Certainly, that
15   could have been the result of this litigation.  We could
16   have -- we have abled counsel, Mr. Greagan.  While Mr. Greagan
17   and I had pretty significant differences in this case, he is
18   a -- and he adversarily came up with a lot of novel ideas
19   about the PLRA and how that could impact on the case, and
20   certainly all of those things could have taken or a ruling
21   contrary to positions we had advanced would have had a
22   dramatic impact on the case and a dramatic impact on our
23   ability to prosecute it and most certainly a dramatic impact
24   on the risk that the Court has assessed here.  I believe it is
25   error for the Court to look at the risks today as compared to
```

1  looking at the risk at the time the case was filed three and a

2  half years ago.

3           I also believe that some of the other

4  Goldberger factors may have been misapplied.

5           And, lastly, I believe that the Second

6  Circuit's most recent pronouncement in the Wal-Mart stores

7  anti-trust case, the Second Circuit -- I believe the

8  multiplier in that case was for a multiplier with an order of

9  magnitude that's far beyond this litigation, far beyond any

10 litigation, frankly, I think, that's ever been litigated, you

11 know, north of Manhattan, you know, approved a multiplier

12 for -- and approved it -- I don't know what the precise

13 attorney fee there was, but I know it was into the hundreds of

14 millions of dollars.  And as part of that analysis and part of

15 the other case law, it talks about kind of a reverse sliding

16 scale when it comes to the percentage fees.  In a smaller case

17 the percentage method becomes more appropriate and a higher

18 percentage can sometimes be appropriate.  We believe the Court

19 has misapplied that as well.

20          Thank you, your Honor, for allowing me making a

21 record.

22          THE COURT:  Certainly.  Mr. Greagan, do you

23 want to be heard on this issue?

24          MR. GREAGAN:  Just very briefly, your Honor.

25 Obviously, the county is in favor of the settlement and

1   supports the settlement of the case and is happy to be

2   resolved in that fashion.  The only thing with respect to the

3   public policy uses of the class action method, certainly, this

4   case and the Marriott case and the Rensselaer case and, you

5   know, that's that's three counties in 62, and I think the

6   Court recognizes that there's -- that there should be -- that

7   this should not be a piñata event against each county based

8   upon the Marriott decision, and I think the Court's finding

9   regarding the fees reflects that.

10                  By the same token, and as to the risks these

11  parties took in bringing this case, and the Court has reviewed

12  the billing records, these two women, Lessie Davies and

13  Nichole McDaniel, were arrested for the first time,

14  apparently, in their lives on June 11, 2004.  Mr. Keach's

15  billing records go back to October 2003, and reflect that he

16  was essentially trolling the Schenectady County Jail for eight

17  months looking for a class representative before these two

18  women were arrested and before the clients in this case ever

19  existed.  Mr. Laduca's affidavit contains a billing record

20  dated June 10, the day before they were arrested, in which

21  they were drafting the complaint against the Schenectady

22  County Jail.  So to say that there was risk involved in

23  bringing this case and that the client relationship and the

24  risk on behalf of these clients was great is simply not true.

25  This is a case where people go looking for parties so that

1  they can sue the county, armed with prevailing case law and a

2  fundamental change as to the counties to make changeouts

3  illegal.  And so every county in the state probably had the

4  same policy and is exposed to the same risk.  And so, I just

5  want to make the record that in this case the evidence

6  provided in support of this motion indicates that the

7  plaintiffs' attorneys in this case were looking to sue the

8  county before anybody walked in their door and said I have

9  been wronged.

10         THE COURT:  Well, let me just make clear, I'm

11  not going to rehash everything I've said, but I want to make

12  certain that the parties understand what I say.  Sometimes I

13  think I was clear, but sometimes the ears aren't -- don't

14  agree with me.

15         What I'm saying about Arbor Hill is this, I'm

16  simply dispensing with the classic definition of the lodestar

17  method.  If that were to be applied as the way it was

18  consistently applied, it would be irrelevant where an attorney

19  was from, it would be what the prevailing rate is for

20  attorneys in this area.  That's the aspect of Arbor Hill that

21  I'm dispensing with when I say that's no longer the standard

22  of what constitutes a reasonable attorney's fee.  That is as

23  substantial an explanation why some of the fees as calculated

24  in the fee schedule submitted by class counsel, they would

25  have exceeded that traditional rate in the Northern District

1    of New York.  I've not discounted them as a result of that.

2    That's the impetus of the Arbor Hill decision.

3                The gist is, is in some respects what

4    Mr. Greagan is pointing to.  It's not the billing records,

5    when they occurred and that kind of thing, that's not the

6    focus.  The focus is, though, what he does point out; that

7    this was an issue that was not novel in this case.  It's an

8    issue that's not novel in this state in light of the state of

9    jurisprudence, and this lawsuit was modeled on those which had

10   occurred before.  So it is simply my view that to effectuate a

11   multiplier in this case under these circumstances, in light of

12   the history of this kind of litigation in the Northern

13   District of New York is simply unwarranted and serves to the

14   detriment of the class.  Nothing changes here other than the

15   amount that goes to the plaintiffs as opposed to the amount

16   that goes to the lawyers.  The overall settlement remains the

17   same.  And in my view, for the reasons I've articulated, and I

18   appreciate the respectful dissent of class counsel, but in my

19   view, that's what's fair and reasonable to the class here and

20   that honors my obligation to look out for them in the details

21   of the settlement agreement.  So I appreciate the parties

22   articulating their positions.  And, of course, they will

23   preserve and effectuate whatever rights they have under the

24   terms of the settlement agreement.  And I certainly have no

25   intention of throwing water on that.  In other words, the

1    parties will do what they believe they ought to do.

2                   I would request that class counsel, consistent

3    with my ruling today, submit a proposed order to me to

4    effectuate -- unless, of course, we want to incorporate the

5    record of these proceedings into the Court's judgment.  And

6    this constitutes the decision of the Court.  What's the

7    parties' preference in that regard?

8                   MR. KEACH:  I have some -- I just have some

9    questions, because I don't, I don't understand quite what the

10   Court announced as far as I didn't hear some of the amounts.

11   And there's also a provision, your Honor, in the settlement

12   agreement that if there is a, if there is an amount that's in

13   dispute pending an appeal, but there are amounts that are

14   undisputed, there will be a partial distribution to the class.

15   So we'd have to incorporate that into the Court's order as

16   well.  Meaning, whatever, obviously, I think we've made clear

17   to the Court our intention.

18                   THE COURT:  That's why I think the proposed

19   order is the better way to go.

20                   MR. KEACH:  Okay.

21                   THE COURT:  Where the parties consult with one

22   another and submit a proposed order to me.

23                   MR. KEACH:  Just so I'm clear, so we can

24   prepare such a proposed order, I believe the Court said

25   $344,795 in attorneys' fees.

1          THE COURT:  That's in the body of my memo and

2    the summary, is $344,756.  I can tell you what I intend.  I

3    intend to approve the fee award sought for the hours billed;

4    that's what I intend to approval.  If there's no dispute as to

5    what that specific number is, submit it to me in the proposed

6    order.

7          MR. KEACH:  I think the next question I have,

8    your Honor, is, does that preclude -- since the Court has

9    awarded attorneys' fees for hours worked, does that preclude

10   class counsel from being compensated both for their time

11   subsequent to the application for attorneys' fees, which,

12   from -- at least from my standpoint is substantial, as well as

13   the time that is required going forward to administer the

14   settlement and deal with the, I think best term I can use,

15   chaos of having to address the claims of almost 900 people

16   people who move, you know, they can't -- you know, we have to

17   track them down, we have to get them their checks; are we

18   precluded from being compensated from that in the Court's

19   order?

20         THE COURT:  You are not.  I have to intention

21   of precluding compensation for hours actually worked at the

22   rates billed.  Do I presume that what you intended to do was

23   to include that in the multiplier so that the Court's order

24   would, if I had authorized the multiplier you sought, you

25   would have eaten those costs as a part of the multiplier.

1          MR. KEACH:  Yes.

2          THE COURT:  All right.  Then how do we

3  orchestrate what my intention is?  To me, that needs to be in

4  the language of a proposed order.  In other words, I would

5  want the proposed order to effectuate what I intend.  What I

6  intend is what you just indicated.  So you're going to have to

7  propose to me what the language of the order is that will

8  effectuate that intent.

9          MR. KEACH:  I have an idea of how to do that.

10  I don't know if your Honor wants me to share it now so we can

11  discuss it or put...

12         THE COURT:  If you think there's going to be

13  any problem with it, throw it out there.

14         MR. KEACH:  Well, I don't ...

15         THE COURT:  I don't know what you mean.

16         MR. KEACH:  Okay.  Obviously, the amount that's

17  set aside for attorneys' fees that goes into an interest

18  bearing account pending appeal, it's -- money is set out of

19  the settlement, and the Second Circuit affirms your Honor's

20  ruling, then a first wave is distributed to the class.  As

21  part of the second wave of checks, that amount will be out

22  there any way, and so basically I would put language in the

23  order that would allow us on an interim basis based on

24  reasonable hours worked to apply to the Court for compensation

25  for work going forward, the Court can consider the fee

1    application, and in the event the Court is amenable to that

2    application, those monies can be deducted from the amount held

3    in escrow pending appeal.

4              THE COURT:  The only thing I'm not -- I'm

5    sitting here pausing on, because I'm not sure what I feel the

6    answer to that is, is whether or not the class ought to bear

7    the responsibility for the appeal.  In other words, I don't

8    know what I feel about saying to you today at this moment that

9    I would authorize expenditure of monies under the appeal

10   authorized by the settlement agreement that would be deducted

11   from the money going to the class.  No question that I would

12   authorize any expenditures necessary to administer the monies

13   going to the class.  In other words, the costs of doing that.

14   So I have no problem with -- and I'm thinking about it as I'm

15   sitting here; I don't know that I've reached a final

16   conclusion on it, but go ahead.

17             MR. KEACH:  Well, I think that that's certainly

18   something that can be incorporated into a proposed order,

19   language to that question.

20             THE COURT:  Exactly.

21             MR. KEACH:  The Court reserves, you know...

22             THE COURT:  Yeah.

23             MR. KEACH:  -- craft something.  And

24   Mr. Greagan, I can reach out to him on that.  What was the

25   amount that the Court approved in out of pocket litigation

1    expenses?

2                THE COURT:  Well, I intend to approve -- I mean

3    I got to be frank with you -- and I'm not throwing stones --

4    your math and numbers were all over the place.  We had a

5    nightmare with that.  But I know what I intend and that's to

6    compensate for the out of pocket cost expenses.

7                MR. KEACH:  Okay.  I think it's --

8                THE COURT:  I can tell you what number I had on

9    that.

10               MR. KEACH:  No, that's fine, your Honor.

11               THE COURT:  I had 9,001.50 in cost and fees.

12               MR. KEACH:  There's an additional thousand

13   dollars in there, but we can work that out with Mr. Greagan.

14               THE COURT:  And I would be happy to incorporate

15   in the order whatever the parties -- in other words, I intend

16   to award the costs and fees.  And then I understood the

17   administrative fees were 107,000.  Those are the numbers I'm

18   working with.

19               MR. KEACH:  Right.

20               THE COURT:  But if the parties tell me that the

21   administrative costs and fees are 10,001.50, that's what I

22   intend.

23               MR. KEACH:  Okay.

24               MR. GREAGAN:  Your Honor, may I be heard

25   briefly on this score?

1                    THE COURT:  Please, please.

2                    MR. GREAGAN:  Just a point of housekeeping.

3       They've retained an administrator for the purposes of doing

4       the ministerial acts.  I would expect that that administrator

5       would handle the trying to track down; that that's not being

6       billed at $250 an hour, that's being billed at this

7       administrator's ministerial acts.  And I assume, I assume the

8       Court is going to be the gatekeeper regarding those things.

9                    THE COURT:  Precisely.

10                   MR. GREAGAN:  All right.  I'm trying to define,

11      I perceive here that I'm going to pay into an escrow account a

12      sum of money the 2.5, less what's already been paid and

13      perhaps wash my hands of this, close my file, stop billing my

14      client for these -- for -- and, and since, pursuant to the

15      agreement, I'm not opposing the appeal, at least I don't think

16      I am, and so, therefore, my day may -- I would like to try to

17      craft this so I can walk away from this thing.

18                   THE COURT:  I have no idea what the appellate

19      rule is in that regard.  You're telling me you won't defend my

20      decision?

21                   MR. GREAGAN:  Well, well, your Honor...

22                   THE COURT:  I'm teasing you Mr. Greagan.

23                   MR. GREAGAN:  That's okay.

24                   THE COURT:  I'm teasing you.

25                   MR. GREAGAN:  I don't know whether that's

1   enforceable or not, or what my obligations are or, more

2   importantly, whether my client wants to pay for it.

3             THE COURT:  I understand it entirely.  And I'm

4   chuckling about it because you got a point.  But you and I

5   know that's subject to the rules and regulations of the Second

6   Circuit, their requirements about appellate practice is

7   concerned, and I don't know what the answer is.

8             Maybe I got to hire a lawyer to defend my

9   decision, I don't know.  (laughter.)

10            MR. GREAGAN:  As I said, my client will no

11   longer have to walk in this fight.

12            THE COURT:  I understand.  And I appreciate

13   your input.  Because what I'm seeking is clarifications of the

14   contingencies that can arise here, so when you submit the

15   proposed order to me, you know what it is that I'm trying to

16   effectuate here.  So the answer is, I want to effectuate

17   whatever the real expenses are, and I want to effectuate

18   whatever the administrative costs are.  And I have no problem

19   with reserving in a trust fund not for immediate distribution

20   to the class settlement proposed costs, fees and

21   administrative expenses to be incurred in effectuating the

22   orders.  The only thing I'm reserving on is whether or not I

23   would include in that sum of money to be paid into the escrow

24   account attorneys' fees for pursuing the appeal.  I got to

25   think about that.

1          MR. MENKEN:  Well, Judge, one other thing to

2    clarify.  And I understand the Court's quagmire on that issue.

3    And then the Court candidly realized that we sort of wrapped

4    up the end game here with the expectation, if you will, that

5    we would receive a multiplier or the percentage of funds

6    method.  Having been rejected on that application, I'm hearing

7    from the Court that in addition to the administration -- and

8    I'm sure your Honor will tell me if I'm wrong, but in addition

9    to the administration, any hours, for example, that were spent

10   preparing for today or working up until today that were not

11   included in the attorney fee application, I would expect we

12   could put in an application for.  And I also --

13          THE COURT:  And I would consider whether I

14   thought the time and purposes --

15          MR. MENKEN:  Was reasonable.

16          THE COURT:  -- was reasonable.  And if so, I

17   would compensate you for that.

18          MR. MENKEN:  Okay.  Because I just want the

19   Court to know, okay, and Mr. Laduca and Mr. Keach can speak

20   for themselves, but any suggestion by Mr. Greagan, okay, that

21   the folks on this side are ambulance chasers or bloodsuckers

22   or anything like that, that's not right.  I mean that's not

23   right.  There was a constitutional violation here from '01 to

24   '03.  I mean there was and Mr. Greagan's chief witnesses

25   conceded that.  There were documents to support that.  So if,

1    in fact, Mr. Keach was --

2                    THE COURT:  Save it.  That part of your record

3    is fine.  You don't need to bore me with that.

4                    MR. MENKEN:  Okey doke.  I am aware of the

5    difficulty there has been as this case has progressed.  I

6    don't condone it.  I don't support it.  I subscribe to the

7    rules of civility.  Mr. Keach knows that well.  And I will

8    enforce them.

9                    THE COURT:  No need to raise those issues.

10   You've made your record to respond.

11                   MR. MENKEN:  Okay.

12                   THE COURT:  And the record is imminently clear.

13   What I'm trying to be crystal clear on is what I would

14   authorize and what I would not in light of the intentions of

15   my ruling which were not anticipated by the parties.  So put

16   it in a proposed order and I'll take a look at it.

17                   MR. MENKEN:  Okay.

18                   MR. GREAGAN:  One more thought, your Honor.

19                   THE COURT:  Go ahead.

20                   MR. GREAGAN:  My thought here is, given the

21   nature of this particular class and their -- and I don't mean

22   in a pejorative way -- the relative interest in this, I don't

23   see any reason to be cutting two checks to these folks as

24   opposed to -- because how much, how much do they get the first

25   time, how much is reserved, how long is this going to take?

1    Since it's all coming out of that common fund, I think it

2    would be administratively easier, and I throw it out for

3    whatever purpose, that the whole thing be paid into the fund.

4    And then once there is a final resolution --

5                    MR. MENKEN:  Agreed.

6                    MR. GREAGAN:  Oh, all right.  Because you were

7    talking about -- well, this is --

8                    MR. KEACH:  No, no, the whole -- your Honor,

9    how the settlement agreement works, Mr. Greagan has to pay

10   2.5 million into the fund.  And, obviously, the Court has

11   reduced our fee substantially and --

12                   THE COURT:  Don't use lodestar.

13                   MR. KEACH:  I'm sorry.

14                   THE COURT:  That's now a no-no.

15                   MR. KEACH:  I'm sorry.  Your Honor has reduced

16   our request for attorneys' fees --

17                   THE COURT:  Teasing you.  Go ahead.

18                   MR. KEACH:  -- quite substantially.  And we,

19   obviously, had that happen to us once before, which,

20   obviously, led to the change of structure in settlements, and

21   in this case is obviously to the benefit of our class members

22   substantially, given the initial estimates of the class size,

23   but the amount of attorneys' fees that the Court has not

24   awarded, the entire thing goes into an escrow account under

25   the express terms of the settlement agreement, so we are going

1    to send out two checks to these folks.

2                    THE COURT:  Okay.

3                    MR. KEACH:  Going to send them a check for 1700

4    and change -- or excuse me -- 1900 and change.  That amount is

5    going to stay in escrow gathering interest.  If the Second

6    Circuit affirms your Honor's ruling, then there will be a

7    second distribution, and the people will be made aware of that

8    as part of the notice they get.  Yeah, Mr. Greagan has to pay

9    in the 2.5 million; he has no obligation after today.

10                   MR. MENKEN:  We're clear.

11                   THE COURT:  Perhaps.  That depends on whatever

12   rule the Circuit has.

13                   All right.  Anything further I can do for you?

14                   MR. KEACH:  Not from the plaintiff, your Honor.

15                   MR. GREAGAN:  Are we still on the record?

16                   THE COURT:  We are unless you want to go off.

17                   MR. GREAGAN:  No, that's okay, as long as we

18   are still on, what will end up being the appellate record, for

19   a comparison, your ruling today is three times what I've

20   charged as of July 31, '07.

21                   THE COURT:  Anything further?

22                   MR. KEACH:  Not from the plaintiff, your Honor.

23                   THE COURT:  Thank you.

24              (Court adjourned at 4:00 PM.)

25                          - - - - -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

40

```
 1

 2

 3                    C E R T I F I C A T I O N

 4

 5

 6          I, BONNIE J. BUCKLEY, RPR, Official Court Reporter

 7    in and for the United States District Court, Northern District

 8    of New York, do hereby certify that I attended at the time and

 9    place set forth in the heading hereof; that I did make a

10    stenographic record of the proceedings held in this matter and

11    caused the same to be transcribed; that the foregoing is a

12    true and correct transcript of the same and whole thereof.

13

14

15

16                                _____

17                                BONNIE J. BUCKLEY, RPR

18                                USDC Court Reporter - NDNY

19

20    DATED:  SEPTEMBER 14, 2007

21

22

23

24

25
```